Harry P. Gamble, Jr., and Gretchen B. Gamble, Husband and Wife v. Commissioner.
Gamble v. Commissioner
Docket No. 44940.
United States Tax Court
T.C. Memo 1955-289; 1955 Tax Ct. Memo LEXIS 49; 14 T.C.M. (CCH) 1115; T.C.M. (RIA) 55289; October 27, 1955
*49 Harry P. Gamble, Jr., Esq., 1316 Henry Clay Avenue, New Orleans, La., and Harry P. Gamble, III, Esq., for the petitioners. Robert B. Wallace, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax for 1949 of $2,240.38 and for 1950 of $7,791.72, of which $1,696.32 and $7,370.68, respectively, remain in dispute. The unconceded items involve two issues: (1) whether certain parcels of real estate sold were capital assets, and (2) whether collections on certain notes and contracts were properly reported as to basis and type of income. Findings of Fact Some of the facts have been stipulated and are hereby so found. Petitioners filed joint income tax returns for 1949 and 1950 with the collector of internal revenue for the district of Louisiana. During these years, they were married and lived together as husband and wife. Gretchen B. Gamble had no separate income of her own, and was engaged in no other activities save that of housewife. Harry P. Gamble, Jr., hereafter refered to as petitioner, is a practicing attorney and notary in New Orleans, Louisiana. In May 1946, petitioner purchased *50 in one transaction from William D. Dutton 24 vacant lots in Morningside Park of Jefferson Parish, 30 lots in Country Club Estates of Baton Rouge, and 11 in Country Club Estates of New Orleans, together with various notes and contracts connected with those lots. Petitioner was primarily interested in the notes and contracts. No real estate agent was involved in this purchase. Petitioner, also not through a real estate agent, purchased property located in Canal Street Subdivision of Jefferson Parish consisting of 36 vacant lots in July 1945, 150 lots in April 1946, and 73 lots in September 1946. He purchased these lots in the closing months of liquidation, at an extremely cheap price, subject to heavy back taxes due the State, in hope of making a profit. There also was the possibility of valuable oil resources on the land. Petitioner purchased additional lots in 1947, 1948, 1949, and 1950. He acquired 150 lots, in six separate purchases, in the Canal Street Subdivision. John R. Kennedy, a real estate agent, handled five of these purchases as well as the purchase of 2 lots in Morningside Park of Kenner, Louisiana. Petitioner purchased 14 lots in Country Club Estates of New Orleans *51 in two transactions handled by Felix O. Ernst, real estate agent. All of these 166 lots were acquired to make a profit on resale. All of the subdivisions had been, by prior owners, surveyed, platted and laid out, including naming of the subdivisions and the streets therein, and the dedication of streets. All lots were acquired and sold by petitioner according to the original subdivision plans. Late in 1946, Kennedy approached petitioner with a proposal for improving the Canal Street Subdivision, and for selling petitioner's lots therein. On January 20, 1947, petitioner signed an agreement with Kennedy covering 1947 and 1948, appointing him petitioner's exclusive real estate agent in the sale of all lots owned or later acquired by petitioner in the Canal Street Subdivision at a commission of 50 per cent. This agreement was extended in writing through February 28, 1949. It has been orally renewed each year and is still effective. Petitioner sold lots in the other subdivisions (except the one in Baton Rouge, in which no lots have been sold) through other agents. Due to the contract between himself and petitioner, Kennedy began to make improvements on the public property in the Canal *52 Street Subdivision early in 1947. He built a bridge across a public canal to make petitioner's property accessible for sale purposes. In 1948 he built two streets approximately 3,000 feet in length, and installed all utilities, except sewerage, all on public property. No other improvements were made in this subdivision, and none were made in any other subdivision in which petitioner owned lots. Prior to the commencement of the street construction, petitioner had purchased 132 lots in the Canal Street Subdivision, 128 facing the proposed new streets. He purchased 18 other lots after construction had commenced. Petitioner was not a party to Kennedy's petitions and applications to public bodies for authority to install the improvements. He was not a direct party to Kennedy's contracts to build the bridge, construct the streets, lay water pipe, install electricity, or to purchase pipe from other sources when it could not be purchased from the drainage district or the power company. Petitioner was not responsible for Kennedy's obligations incurred in connection with the improvements, except as endorser of his note. In order to finance the improvements in Canal Street Subdivision, *53 Kennedy borrowed $35,000 from a bank on a note which petitioner endorsed. At the request of the bank, about 6 months after the money was borrowed, petitioner assumed the loan. He paid the $35,000 and charged the payments on his books against Kennedy's account. To this account he also charged the interest accrued on the loan, and all cash advancements made to Kennedy. When Kennedy was entitled to a commission from a sale, petitioner credited this account with the commission. At his own expense and in his own name, as real estate broker, Kennedy advertised the Canal Street Subdivision property for sale. He paid commissions to other real estate brokers who sold lots in the subdivision and handled the entire matter of sales at his own expense. He handled every other detail with reference to the entire subdivision so that people in the area spoke of it as the "Kennedy Subdivision." Petitioner passed on all sales and personally financed every sale not made on a cash basis. To stimulate sales in the Canal Street Subdivision, petitioner constructed three houses there which were sold in 1949, 1950, and 1951, respectively. Petitioner made the following separate sales of one or more lots: *54 7 in 1947, 25 in 1948, 33 in 1949, 37 in 1950, and 44 in 1951. He made all sales through licensed brokers not connected with him except as real estate agents. Agreed commissions were paid them. Petitioner had no business office other than his law office. He had no real estate broker's nor agent's license, and paid no occupational tax as such. No other person had any interest in his real estate at any time, other than the aforementioned contracts with the real estate brokers. In 1949 and 1950 petitioner reported the profit from the sale of lots held for more than 6 months, as long-term gain from the sale of capital assets. In petitioner's income tax return for 1949 he reported the proceeds of four securities, and for 1950 the proceeds of one security as resulting from sales of capital assets held for more than 6 months. These securities were mortgage notes and contracts which had been a part of the group purchased from Dutton in May 1946 simultaneously with the purchase of lots with which they were identified. The notes and contracts were purchased at a bulk price, as if it had been the purchase of one obligation. Petitioner was obligated to fulfill certain commitments of the *55 prior owner, Dutton, regarding the collection of the notes and contracts; that is, to retain in trust certain percentages of collections for future street improvements in the three subdivisions involved. The Baton Rouge trust funds were paid over to a bank and are unused. The New Orleans trust funds were returned to Dutton, not having been used within the time stipulated in the trust agreement. The Jefferson Parish trust funds were paid over to the town of Kenner for street improvement in Morningside Park. Petitioner reported no profit on any of his collections from these notes and contracts until he had regained the purchase price of the entire group. He made no effort to place values on any of the individual notes. Then, as he made collections, he reported them, using a cost basis of zero, as gain from the sale of capital assets held more than 6 months. The mortgage notes and contracts were not sold by petitioner. The sums shown in the returns reflect collections by him. In 1949, petitioner earned interest income of $17,680.07, net profit from legal profession of $7,864.25, profit from the sale of real estate of $9,196.82, and income from mortgage collections of $1,683.93. In *56 1950, he earned interest income of $19,755.85, net profit from legal profession of $15,529.05, profit on the sale of real estate of $28,783.10, and income from mortgage collections of $239.72. The sales of real estate were sales of lots held for sale to customers in the ordinary course of business. Collections received from mortgage notes and contracts did represent ordinary income from retirement of indebtedness. Opinion I. The often litigated question of whether petitioner realized ordinary income rather than capital gain from the sale of real property subdivided into lots is once more before us. The factors to be taken into consideration have been so frequently catalogued that repetition should be unnecessary. See, e.g., ; Di Lisio et ux. v. Vidal (D., N.M.), - A.F.T.R. -; . Under all the present circumstances, we think the question whether petitioner was holding these lots for sale to customers in the ordinary course of his trade or business, so as to preclude treatment as capital gain, can be answered only in the affirmative. The property *57 was concedely acquired for the purpose of development and sale. The transactions during the years before us maintain a high degree of frequency and continuity. In the 2 years in issue, 159 lots were sold with transactions occurring three times every month on the average. While it is true petitioner arranged for some of the activity to be carried on by a real estate agent, it is clear that the former's participation was intimate and virtually continuous. The agent had no authority to fix terms or make the final decision with respect to any sale. It follows that petitioner must have devoted his time and attention to consideration of specific transactions almost continuously. And while the improvements were originally financed by a bank loan, it was apparently necessary for petitioner first to endorse the note, then to assume the loan and finally to make the payment. Under the circumstances, we cannot say that the activity undertaken by the agent was so far removed from that of petitioner that it should not be considered a part of petitioner's business. Finally, one engaged in the continuous purchase and sale of property, as this petitioner was, has dealing with a "customer" whenever *58 he sells. . On a consideration of the entire record and of all the elements bearing on the question, we have found as a fact that petitioner was engaged in the real estate business and that these properties were sold in its ordinary course. II. Petitioner's treatment of the amounts received in liquidation of the notes purchased by him in bulk seems to us clearly erroneous, as petitioner now himself asserts. Although the consideration was paid in a lump sum, the property acquired is easily divisible into its various segments. This is not such a case as , where undivided interests in a single piece of property were in controversy. Under these circumstances, as disposition of each part was made, a portion of the basis should have been allocated to it. . See . If that were done the transactions would have been closed at the time of the collection of each note, events which, in some instances, did not occur during the period in controversy. Petitioner, however, expressly waives any contention that the transaction *59 should be treated as having been completed in other years when he says: "Should the Court decide that the methods contended for by both petitioners and the Commissioner are incorrect, and that another method would have been correct, which correct method would entail throwing petitioners' profit into one or more years prior to 1949, petitioners will voluntarily waive prescription (statute of limitations) as to the tax deficiency (but not as to the interest which would be due thereon) which would have been due if the correct method of reporting the income had been followed." [Pet. br., p. 4.] And in the absence of any more specific evidence we conclude that an allocation of basis founded upon the face value of the respective obligations will most nearly reflect the fair market values and hence the correct proportionate basis to be applied to the individual items. We assume that both of the foregoing details can be agreed upon in the recomputation. It is not possible, however, to discover any theory upon which the payments on the notes can be treated as capital gain. None of the collections constituted a "sale or exchange." . *60 Petitioner has referred us to no authority and we have found none which would permit these items to be treated as other than ordinary income. To permit adjustment of the allocated costs, Decision will be entered under Rule 50.